IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

JEROME KNOX,                         :
                                     :
    Plaintiff,                       :
                                     :        No. 3:13-cv-70 (CAR)
    v.                               :
                                     :
DOUGLAS B. WHITE, in his Official    :
Capacity as City Manager of Social   :
Circle, Georgia; and THE CITY OF     :
SOCIAL CIRCLE, GEORGIA,              :
                                     :
    Defendant.                       :
_____      :

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Jerome Knox brings this action for racial harassment and discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and 42 U.S.C. §§ 1981 and 1983. Plaintiff contends that The City of Social Circle (the "City"), and the City Manager, Douglas B. White, subjected him to harassment in the workplace and discharged him because he is African American. Before the Court is Defendants Douglas B. White's and the City's Motion for Summary Judgment [Doc. 31]. After fully considering the matter, the Court finds Defendants are

1

entitled to judgment as a matter of law, and their Motion for Summary Judgment [Doc. 31] is hereby **GRANTED**.[1]

## BACKGROUND

In May 2008, Plaintiff Jerome Knox ("Plaintiff"), an African-American male, applied to work in the City's Street Department, which is responsible for maintaining the City's streets.[2]  Defendant Douglas White saw the application and, having known Plaintiff's father, referred the application to the Street Department's supervisor, J.C. Wright.[3]  Subsequently, Wright recommended the City hire Plaintiff, and Defendant White approved the recommendation.[4]  While employed as a Street Department worker, Plaintiff's general duties included picking up leaves, trash, limbs, and debris around the city, cutting grass, and placing limbs in the City's wood chipper machine.[5]

Plaintiff was employed with the City from May 2008 until his termination on November 23, 2010.[6]  Although Plaintiff voiced his concerns regarding safety issues within the department, Plaintiff continued to work for Defendants without serious

---

[1] Plaintiff's Motion to Supplement Plaintiff's Response [Doc. 46] is Granted.
[2] White Dec., [Doc. 31-6], at para. 2.
[3] *Id.*
[4] *Id.*
[5] Pl. Dep., [Doc. 33] at 65-67.
[6] *Id.* at 65, 199.

incident for two years.[7]  From August until November of 2010, a series of escalating events led to Plaintiff's termination.

Before August 2010, Plaintiff had never heard a single racial slur or comment used by any City employee in reference to him;[8] Plaintiff did, however, once witness (unclear when) a coworker make a monkey-like gesture while driving past him.[9]  On August 18th, Plaintiff was at a gas station before going to work when a City firefighter, Toby Casey, and Casey's friend entered the store.  Plaintiff did not know either Casey or his friend at the time, but he was aware that Casey worked for the City.[10]  Casey's friend looked at Plaintiff and said, "[t]here go Kunta Kinte,"[11] and Casey responded, "[b]ut I'm Toby Kunta Kinte."[12]  Plaintiff immediately went to work and reported the incident to Wright and his coworker, Curtis Hudson, who was also a volunteer

---

[7] The Court does note that in July 2009, Plaintiff was written up for insubordination by his immediate supervisor, Wright, and warned that future incidents could lead to termination. Pl. Dep., [Doc. 33] at 173-79; Wright Dec., [Doc. 31-5, Exhibit A] at para. 2.  The incident involved a heated conversation between Plaintiff, Wright, and another coworker regarding why Plaintiff wanted to be issued new gloves. Pl. Dep., [Doc. 33] at 173-79.  Plaintiff refused to sign the disciplinary warning because he felt he did not deserve it and that it was an inaccurate reflection of what occurred. *Id.* at 177.  Though Defendants address this event in their brief it was not listed as a reason for termination.  Pl. Formal Notice of Termination [Doc. 40, Exhibit A] at 4.

[8] Pl. Dep., [Doc. 33] at 45-46.  Plaintiff was aware that sometime between March and November of 2010 that a coworker had used racial slurs in reference to his supervisor, Wright. *Id.*

[9] *Id.* at 138.

[10] *Id.*  at 124-25.

[11] "Kunta Kinte" is a reference to a black slave from the novel and mini-series Roots.

[12] Pl. Dep., [Doc. 33] at 124-25, 127.  Plaintiff was the only black person in the gas station when these racial comments were made. *Id.*

3

firefighter and might have known Casey's name.[13]  Wright told Plaintiff to ignore the comments and did not take any further action.[14]  Plaintiff did not report this incident to Defendant White because he did not know Casey's name.[15]

The following day, August 19th, Plaintiff learned there was a bench warrant out for his arrest.[16]  The bench warrant was issued because Plaintiff had received an extension on a court date for his traffic ticket, but it was mistakenly left on the August calendar.[17]  Plaintiff asked for permission from his supervisor, Wright, to go to City Hall to handle the matter.[18]  When Plaintiff arrived at court, he was still on duty and in his City uniform.[19]  Plaintiff spoke with a court clerk, Sherry Crutchfield, who insisted Plaintiff was supposed to be in court that day.[20]  Plaintiff and Crutchfield both raised their voices trying to get their point across, and Plaintiff loudly told Crutchfield to "just

---

[13] *Id.* at 127.  At the City's Thanksgiving dinner Plaintiff was able to point out Casey, at which point his coworkers told him Casey's name. *Id.* at 129.

[14] *Id.* at 129.  The Court notes that Defendants dispute this, as Wright says he has never had employees come to him with issues of racial insensitivity. Wright Dep., [Doc. 48-5] at 25-26.

[15] Pl. Dep., [Doc. 33] at 129-30.

[16] *Id.* at 181.

[17] Pl. Aff., [Doc. 37-3] at para. 30.

[18] Pl. Dep., [Doc. 33] at 181-82.

[19] *Id.* at 182.

[20] *Id.* at 182-85; Crutchfield Dep., [Doc. 54-1] at 18.

fix" his paperwork.[21]   After fixing the mistake, Crutchfield critiqued and lectured Plaintiff for telling the ticketing officer that he worked for the City.[22]

Later the same day Plaintiff was working with a community service worker, Stephen.[23]   The City often staffed community service workers to work alongside Plaintiff and other employees to help them with their daily activities.[24]   Stephen told Plaintiff that while working with the Gas Department a worker, Kenneth Stevenson, used racial slurs and made threats about Plaintiff.[25]   Stevenson allegedly called Plaintiff a "nigger," "dumb nigger," "monkey," and "motherfucker," and threatened "to bust" Plaintiff "in the head with a shovel."[26]   Plaintiff says he reported this to Wright the same day, and both men agreed to discuss it with Defendant White the next day.[27]

---

[21] Pl. Dep., [Doc. 33] at 182-85.   The Court notes that Defendants dispute how this exchange occurred.   City Hall employees who heard the encounter provided White with written statements saying that Plaintiff yelled at Crutchfield to "just fix it." White Dec., [Doc. 31-6, Exhibit D].   Additionally, Crutchfield's deposition says that Plaintiff became angry with her and yelled at her, making her feel threatened. Crutchfield Dep., [Doc. 54-1] at 18.

[22] Pl. Aff., [Doc. 37-3] at para. 30.   The ticketing officer made a note on the ticket that subject worked for the City. Crutchfield Dep., [Doc. 54-1] at 19.   Plaintiff was unaware that this had been reported on his ticket because he did not make a statement about working for the City.   Pl. Aff., [Doc. 37-3] at para. 30.

[23] Stephen was an inmate and his last name is unknown.

[24] Community service workers included both those criminally charged and convicted by the City for traffic offenses and other crimes, and those incarcerated at the Walton County Jailhouse.   Pl. Aff., [Doc. 37-3] at para. 5.

[25] Pl. Dep., [Doc. 33] at 128; Pl. Aff., [Doc. 37-3] at para. 10.   Plaintiff recorded the conversation between Stephen and himself. *Id.*

[26] *Id.* at 138, 158-59, 217-18; Pl. Aff., [Doc. 37-3] at para. 10.

[27] Pl. Dep., [Doc. 33] at 220-21.

However, the next day, White approached Plaintiff regarding his confrontation with Crutchfield, the court clerk, and his recent job performance.[28]   In August, Defendant White received several complaints about tree limbs not being picked up in the community and received concerns from Plaintiff's coworkers that he was not doing his job.[29]   Due to these reports, White decided to drive around and investigate the situation.[30]   On August 18, 2010, White witnessed Plaintiff drive past several piles of limbs without stopping, and White drove around the next day confirming that these piles had still not been picked up.[31]   White told Plaintiff he "didn't see [him] do a God damn thing yesterday,"[32] and Plaintiff reacted by standing up and defending himself.[33] A heated conversation ensued where Plaintiff told White he was doing his job, but he was asked to cover another coworker's route on the 18th.[34]   Plaintiff's supervisor, Wright, was soon called over and confirmed Plaintiff was covering a coworker's shift

---

[28] *Id.* at 163

[29] White Dec., [Doc. 31-6] at para. 3-4.

[30] *Id.*

[31] *Id.* at para. 4.

[32] Pl. Dep., [Doc. 33] at 163. Defendants dispute the use of "God."

[33] White Dec., [Doc. 31-6] at para. 6; Pl. Aff., [Doc. 37-3] at para. 16-17.  The Court notes that Defendants dispute how this confrontation took place. White Dec., [Doc. 31-6] at para. 6.

[34] Pl. Dep., [Doc. 33] at 222-23. During this conversation Plaintiff also told White that he kept a log of his daily activities and that he had been thanked by a City resident for having done a good job. Pl. Aff., [Doc. 37-3] at para. 16-17.   The log Plaintiff mentions was never produced to White, and Plaintiff says he did not keep a log of his activities that day because he was not working his normal route. Pl. Dep., [Doc. 33] at 80-81.

6

on August 18th.[35]  White also told Plaintiff that he had been disrespectful to the woman at the court house, and White was going to investigate the situation.[36]  White did apologize to Plaintiff for speaking to him in a manner unbecoming for a City Manager, but he still felt Plaintiff's reaction was an inappropriate way to speak to a supervisor.[37]

Approximately a month later, Defendant White learned Plaintiff appeared in court for his hearing on the traffic ticket.[38]  Plaintiff pled guilty and was ordered to pay a fine, but as Plaintiff was leaving the courtroom another officer overheard him threaten the ticketing police officer.[39]  The Judge held Plaintiff in contempt of court for his threat and required Plaintiff to serve a 24-hour jail sentence.[40]

On November 4, 2010, Plaintiff witnessed two Street Department workers, Rick McCullers and Lee Ray, taking apart the City's leaf vacuum machine.  Plaintiff knew the machine had just been to the repair shop and marked in good working order, so he

---

[35] Pl. Aff., [Doc. 37-3] at para. 16-17.

[36] Pl. Dep., [Doc. 33] at 223-24.

[37] Pl. Aff., [Doc. 37-3] at para. 16-17; White Dec., [Doc. 31-6] at 6.

[38] Pl. Dep., [Doc. 33] at 185-86.

[39] White Dec., [Doc. 31-6, Exhibit C] at 15-17.  Plaintiff allegedly said, "You lying motherfucker. I will get you," or something to that effect. *Id.*

[40] Dally Dec., [Doc. 31-4] at para. 3; Pl. Dep., [Doc. 33] at 187-90.  Plaintiff denies threatening a police officer and says he was held in contempt for calling the police officer a liar. Pl. Dep., [Doc. 33] at 187-88.

approached McCullers to determine what was going on.[41]  This resulted in an argument between McCullers and Plaintiff, and Plaintiff asked another coworker to call their supervisor.   Wright arrived and explained the machine was not broken, but the argument continued.  McCullers became angry and yelled in front of all his coworkers, the majority of whom are African-American, that he "was stuck down in a zoo crew."[42] Wright called Defendant White to notify him an argument had broken out in the Public Works building amongst the employees.[43]  When White arrived he asked to speak with the supervisors, Wright and Robbie Miller, to determine what happened.[44]  Plaintiff tried to insert himself into the conversation, and White told him to "take a hike."[45]

After this final incident on November 4, 2010, Defendant White decided he had no choice but to terminate Plaintiff.[46]   On November 23, 2010, White and Wright

---

[41] McCullers said that Robbie Miller, the Utilities Director, had told him to repair the machine. McCullers Dec., [Doc 31-3] at para. 3.  However, Plaintiff claims Miller knew the machine was fixed because he heard the repair store tell Miller the machine was in good working order. Pl. Aff., [Doc. 37-3] at para. 11.

[42] Pl. Dep., [Doc. 33] at 19.  McCullers does not dispute making this comment, but says it was not in a derogatory manner. McCullers Dec., [Doc. 31-3] at para. 3.

[43] White Dec., [Doc. 31-6] at para. 12.

[44] *Id.*

[45] Pl. Dep., [Doc. 33] at 192; White Dec. [Doc. 31-6] at para. 11.

[46] White Dec., [Doc. 31-6] at para. 12.  Defendant White felt that Plaintiff had instigated the fight with McCullers and claims he repeatedly told Plaintiff to back off before Plaintiff would listen. *Id.*  Additionally, Defendant White had already began investigating the court clerk incident and received written statements that Plaintiff yelled at Crutchfield and that she had felt threatened. *Id.* at 10.

brought Plaintiff into White's office and explained it was no longer working out.[47] White told Plaintiff that he was being terminated due to ineffective job performance, insubordination, and unbecoming conduct of a City employee, based on the above incidents.[48]  Plaintiff did not sign the termination letter and did not attempt to appeal it to the City Council.[49]

Plaintiff filed a discrimination complaint against the City with the Equal Employment Opportunity Commission ("EEOC") on October 12, 2010, and filed the instant suit against Defendants on July 19, 2013.[50]

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[51]  A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[52]  Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the

---

[47] Pl. Dep., [Doc. 33] at 199-200.
[48] *Id.* at 200-01; White Dec., [Doc. 31-6] at para. 9.
[49] Pl. Dep., [Doc. 33] at 203-204.
[50] [Doc. 1].
[51] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[52] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[53]  When ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the party opposing the motion.[54]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[55]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[56]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[57]

## DISCUSSION

### Defendant White's Official Capacity Liability

---

[53] *See id.* at 249-52.
[54] *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir. 1992).
[55] *Celotex Corp.,* 477 U.S. at 323 (internal quotation marks omitted).
[56] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.,* 477 U.S. at 324-26.
[57] *See Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir. 1991).

Plaintiff brings a Title VII claim against Defendant White in his official capacity as City Manager of Social Circle, Georgia.[58]  Claims brought under Title VII may only be brought against the employer because "[t]he relief granted under Title VII is against the employer, not individual employees whose actions constitute a violation of the Act."[59] The parties do not dispute that the City is Plaintiff's employer.  Accordingly, the Court construes Plaintiff's Title VII claims against White in his official capacity as claims against the City. [60]  Therefore, Defendant White in his official capacity is entitled to summary judgment on Plaintiff's Title VII Claims.[61]

Plaintiff also brings a claim against White in his official capacity as City Manager under 42 U.S.C. § 1983.[62]  A § 1983 claim against an official in his or her individual

---

[58] Plaintiff's complaint stated "Douglas B. White, in his official capacity as City Manager of Social Circle, Georgia," [Doc. 1], and Plaintiff does not contest this in his response to Defendants' Motion for Summary Judgment.

[59] *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) ("Individual capacity suits under Title VII are … inappropriate.")

[60] *See Johnson v. Bibb Cnty. Bd. Of Educ.*, No. 5:07-CV-425(CDL), 2009 WL 1885052, *6 (M.D. Ga. June 29, 2009).

[61] Additionally, if Plaintiff intended to bring claims against White in is individual capacity, Title VII does not impose individual liability and summary judgment is appropriate.  *See Johnson*, No. 5:07-CV-425(CDL), 2009 WL 1885052, at *6 ("[I]t is well established that Title VII does not impose individual liability.")

[62] The Court declines to address Plaintiff's 42 U.S.C. § 1981 claims separately because the same analysis under § 1983 applies to § 1981 claims.  The Supreme Court has held "that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736 (1989); *see also Brown v. City of Fort Lauderdale*, 923

11

capacity is "simply another way of pleading an action against an entity of which an officer is an agent."[63]   Because local government units can be sued directly, there is no longer a need to bring official-capacity actions against local governments officials.[64] Plaintiff's claim against White is duplicative of his claim against the City.   Therefore, Defendant White is entitled to summary judgment on Plaintiff's § 1983 claim.

## Defendant The City of Social Circle's Municipal Liability

Plaintiff brings hostile work environment and racial discrimination claims against the City, pursuant to Title VII, § 1981, and § 1983.   Title VII, § 1981, and §1983 claims are functionally equivalent for summary judgment purposes,[65] as each statute has "the same requirements of proof and use[s] the same analytical framework."[66] Thus, the Court will address Plaintiff's Title VII claims with the understanding that the analysis applies to § 1981 and § 1983 claims.

F.2d 1474, 1481-1482 (11th Cir. 1991) (declining to address § 1981 claims against the city and city officials because the remedy is available under § 1983).

[63] *Busby*, 931 F.2d at 776 (internal quotation marks omitted) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1978)).

[64] *Id.* at 776 ("Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials….").

[65] *See Patterson v. McLean Credit*, 491 U.S. 164, 185-87 (1989) (finding that the *McDonnell Douglas* framework for proving intentional race discrimination is applicable to § 1981 claims); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (applying the same hostile work environment analysis to both Title VII and § 1981 claims); *Cross v. Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995) (holding that where § 1983 is used as a parallel remedy for a violation of Title VII, the elements of the causes of action are the same).

[66] *Standard v. A.B.E.L. Serv., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

## I. Hostile Work Environment

Plaintiff asserts that he was subjected to racial harassment by City employees and management, creating a hostile work environment.  A hostile work environment claim is "established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[67] For Plaintiff to recover on his hostile work environment claim, he must prove: (1) that he belongs to a protected group; (2) that he has been subjected to unwelcome harassment; (3) that the harassment was based on a protected characteristic; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminative and abusive working environment; and (5) a basis for holding the employer liable under either a theory of vicarious or direct liability.[68]   Here, like most hostile work environment claims, Defendants argue that Plaintiff is unable to prove the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment.  The Court agrees.

### A.  *Harassment Sufficiently Severe or Pervasive*

---

[67] *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (international quotation marks omitted) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).
[68] *Id.*

The severe or pervasive element of the hostile-work-environment claim contains both a subjective and objective analysis.  To satisfy these requirements, Plaintiff must produce evidence from which a reasonable juror could conclude (1) Plaintiff subjectively perceived his work environment to be hostile or abusive and (2) a reasonable person would find the work environment hostile or abusive.[69]  Because Defendant does not dispute that Plaintiff subjectively perceived a hostile work environment, the Court will focus on the objective analysis.

In evaluating whether a reasonable person would find the work environment hostile or abusive, the Court considers the following factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."[70]  The Court must examine the alleged conduct collectively, "not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive."[71]  Though there is no "magic number" of comments or behavior that must be done to create a hostile work environment,[72] mere offhanded comments and

---

[69] *Miller*, 277 F.3d at 1276.

[70] *Id.*

[71] *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).

[72] *Miller*, 277 F.3d at 1269.

14

"isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."[73]

Considering this evidence in a light most favorable to Plaintiff, assuming all of the evidence is admissible, the Court concludes Plaintiff cannot establish a *prima facie* case of hostile work environment based on his race.

Plaintiff presents the following facts as evidence that he was subjected to a hostile work environment: (1) Plaintiff witnessed a Gas Department worker, Kenneth Stevenson, making monkey-like gestures as he drove by Plaintiff at work;[74] (2) Sometime between March and November of 2010, Plaintiff witnessed a coworker tell their black supervisor, Wright, that Stevenson had called Wright a "dumb nigger" and stated Wright should not be a supervisor;[75]  (3) On August 19, 2010, a City community service worker told Plaintiff that Stevenson referred to Plaintiff as a "nigger," "monkey," and "motherfucker," and that Stevenson threatened to hit Plaintiff in the

---

[73] *Faragher v. City of Boca Raton*, 524 U.S. 775, 2283 (1998) (internal quotation marks omitted).
[74] Pl. Dep., [Doc. 33] at 138.  Note, that it is unclear in Plaintiff's deposition when this incident occurred.
[75] *Id*. at 157-58.

head with a shovel;[76] and  (4) On November 4, 2010, Rick McCullers yelled that he "was

stuck down in a zoo crew," after Plaintiff advised him not to work on the equipment.[77]

>    1. *Frequency & Severity*

Even if the Court assumes each of these comments are racially offensive, they do

not rise to a level of frequent or severe necessary to support a showing of a hostile work

environment.[78]  To sustain a hostile work environment claim based on racial comments,

---

[76] *Id*. at 53, 158-59; Pl. Aff., [Doc. 37-3] at para. 10.

[77] *Id*. at 19, 159; Pl. Aff., [Doc. 37-3] at para. 11.  Plaintiff also alleges there was a divide amongst the Gas Department employees, who were mainly white, and the Street Department employees, who were mainly black.  Plaintiff claims his white coworkers did not like him and were trying to get him fired.  Pl. Dep., [Doc. 33] at 117.  However, Plaintiff fails to provide evidence that connects this to his race.  He states he felt his coworkers did not like him because of his race and claims he complained about this many times to Wright, but he cannot point to a specific time, other than the "Kunta Kinte" remark,  that he complained about feeling racially discriminated against and never filed a form complaint. *Id.* at 110-11.

[78] *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251-54 (11th Cir. 2014) (finding that a reasonable jury could conclude the conduct was severe or pervasive when Plaintiffs were subject to several offensive racial slurs and experienced some type of harassing conduct "every morning, "every day," "regularly," or "all the time"); *Jones*, 683 F.3d at 1299-1302 (finding a genuine issue of material fact where plaintiff was subjected to seven incidents of racial harassment – one racial remark from a supervisor, four incidents of bananas found on his truck followed by coworkers wearing shirts or hats bearing the confederate flag, and an intimidating confrontation with a coworker); *Guthrie v. Waffle House, Inc.*, 460 Fed. App'x 803, 803, 807-808 (11th Cir. 2012) (finding that a few dozen offensive comments or actions, including sexual comments and being grabbed in the rear, spread over an eleven month time frame, though rude and boorish, fell short of severe and pervasive harassment); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 812 (11th Cir. 2010) (concluding there was a genuine issue of material fact when the sexually offensive remarks and conduct occurred "every single day," and was ignored over her repeated complaints); *Miller*, 277 F.3d at 1276 (holding that explicit racial name calling, which occurred three to four times a day for a month, met the frequency requirement); *see also Forson v. Columbia Farms Feed Mill*, 34 F.Supp.3d 1302, 1305-1307 (M.D. Ga. 2014) (granting summary judgment for the employer because the twelve incidents of harassing remarks, 9 of

this offensive conduct "must be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'"[79]   The Court finds that the conduct and threats Plaintiff alleged were not frequent or severe enough to create a hostile work environment.

Plaintiff only provided four specific examples of hostile or abusive conduct over the course of his two year employment, as well as the "Kunta Kinte" comment, which did not occur at work.[80]   Moreover, Plaintiff was only present for two of the incidents that were directed at him—the monkey-like gestures and the "zoo crew" comment. Plaintiff mainly relies on third parties who later told Plaintiff that his coworkers used racial epithets and threatened to harm him.   However, in order for conduct learned through hearsay to support a hostile work environment claim, Plaintiff must have been "aware of the harassing incidents at the relevant time."[81]   The Eleventh Circuit has held that "a plaintiff's workplace circumstances does not include other employee's

---

which were racial, were more analogous to the *Adams'* Plaintiffs that did not meet the "severe or pervasive" requirement for hostile work environment).

[79] *Hudson v. Norfolk Southern Ry. Co.*, 209 F.Supp.2d 1301, 1325 (N.D. Ga. 2001) (quoting *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990)).

[80] *See Succar v. Dade Cnty. Sch. Bd.*, 60 F.Supp.2d 1309, 1311 n.4 (S.D. Fl. 1999) (refusing to consider events that took place outside work hours and off school premises in the hostile work environment claim); *see also Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) ("[N]ot every uncalled for, ugly, racist statement by a co-worker is an unlawful employment practice.")

[81] *Id.* at 1326-27 (*citing Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995)).

experiences of which the plaintiff is unaware."[82]   Plaintiff's coworkers stated in their affidavits that Stevenson and McCullers frequently used racial epithets and slurs in reference to Plaintiff and other black employees and made racist comments about their supervisor, Wright, during work.[83]   Because these coworkers did not tell Plaintiff about these comments until after Plaintiff was terminated, he cannot now rely on their experiences, which he was unaware of, to create a hostile work environment.   Based on the evidence presented, Plaintiff has not shown a genuine issue of material fact as to whether the alleged harassment was objectively severe or pervasive enough to establish a *prima facie* case of a racially hostile work environment.

> 2.   *Physically Threatening or Humiliating Conduct & Unreasonable Interference with Job Performance*

The racial slurs Stevenson used when referring to Plaintiff and threatening to hit Plaintiff with a shovel were both hateful and physically threatening.   Also, the monkey gestures and "zoo crew" comment could be viewed as humiliating to an objectively reasonable person.   However, Plaintiff has not shown that he was subjected to an overall threatening or humiliating work environment based on his race, nor has he shown this conduct to be so repeated and escalated as to be the "centerpiece" of his

---

[82] *Adams*, 754 F.3d at 1250.
[83] Rushton Aff., [Doc. 37-4] at para. 9; Spencer Aff., [Doc. 37-5] at para. 5.

claim.[84]   Moreover, Plaintiff has failed to argue how this work environment or discriminatory conduct had an unreasonably adverse effect on his job performance.

Viewing the evidence in the light most favorable to the Plaintiff, the Court finds Plaintiff has failed to produce sufficient evidence from which a reasonable jury could find the alleged conduct was sufficiently severe or pervasive to establish a racially hostile work environment.  Because Plaintiff failed to establish a *prima facie* case, the Court must grant summary judgment to the Defendants on Plaintiff's hostile work environment claims.

## II. Discrimination

### A. <u>Section 1983 and Municipal Liability</u>

With regard to Plaintiff's 42 U.S.C. § 1983 claim against the City, it is well established that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees and agents."[85]   "Instead, in order to recover against a municipality, a plaintiff must establish that the alleged racial discrimination or

---

[84] *See Adams*, 854 F. 3d at 1251-55 (describing the conduct as sufficiently threatening and humiliating harassment when Plaintiffs found a noose in the breakroom, saw racially offensive graffiti multiple times in the bathroom, and was subjected to the daily presence of Confederate flags on coworkers apparel); *Jones*, 683 F.3d at 1304 ("It is this escalation of incidents, with a possibly threatening confrontation as its centerpiece, that makes the issue of racial harassment ... one for the trier of fact. Consequently, we believe that the increasing frequency and seriousness of the harassment experienced by [Plaintiff] presents a jury question on the issue of whether he endured a hostile work environment.").

[85] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

harassment occurred pursuant to a custom or policy of the municipality."[86] Additionally, a municipality may be liable for a single act or decision if the municipal official is the final policymaker for the municipality.[87]  However, "final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review."[88]

The record reflects no evidence establishing any of the alleged violations of Plaintiff's rights were the result of a policy or custom of the City.[89]  The City has a disciplinary and grievance policy that allows employees to request a name-clearing hearing or file a grievance after an adverse action is taken against them.[90]  Plaintiff was terminated by Defendant White and given an opportunity to appeal this decision to the Mayor and the City Council, pursuant to the City's disciplinary policy, which Plaintiff declined to do.[91]  Because Plaintiff had an opportunity to avail himself of a meaningful administrative review by the City Council, Defendant White is not a final policymaker

---

[86] *Busby*, 931 F.2d at 776.

[87] *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989).

[88] *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997).  Further, the review process does not have to occur automatically to satisfy the "meaningful review" requirement.  *Id.* at 1402 ("[I]t is clear that [the city manager and public safety director] do not become final policymakers for § 1983 purposes simply because persons who disagree with their decisions have to file an appeal in order to have those decisions reviewed.")

[89] Plaintiff failed to make an argument or provide sufficient evidence to find that the City had a custom or practice of racial discrimination.

[90] White Dec., [Doc. 31, Exhibit F, G] at 26-38.

[91] Pl. Dep., [Doc. 33] at 203-04.

with regard to his termination, and Plaintiff cannot establish municipal liability regarding his § 1983 claim.[92]  Therefore, the City is entitled to summary judgment on Plaintiff's § 1983 claim.

B. *Title VII Claims*[93]

Plaintiff claims Defendants terminated his employment because of his race in violation of Title VII.  Claims of race discrimination based on circumstantial evidence, as is the case here, are evaluated under the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*.[94]  First, a plaintiff must establish a *prima facie* case, or "facts adequate to permit an inference of discrimination."[95]  If the plaintiff does so, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for its action.[96]  If the employer meets this burden, the plaintiff then has an

---

[92] Plaintiff does not provide facts that show the City tacitly ratified the City Manager's termination decisions or argue that he was denied an opportunity for meaningful review by the City Council. Plaintiff merely states he has a right to pursue a legal claim against the City under Title VII. Pl. Amended Resp., [Doc. 39, Exhibit 2] at 20.

[93] Even if evidence was presented that Defendant White was a final policymaker to establish municipal liability for § 1983 purposes, a race discrimination claim under § 1981 and 1983 is analyzed the same way under Title VII.  *See Standard*, 161 F.3d at 1330.

[94] 411 U.S. 792 (1973).

[95] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

[96] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

21

opportunity to show that the employer's proffered reasons for the adverse employment action were merely pretext for discrimination.[97]

To establish a *prima facie* case of discriminatory discharge, Plaintiff must produce circumstantial evidence showing that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated individual outside his protected class or was replaced by a person outside of his protected class.[98]  In this case, Plaintiff cannot establish his *prima facie* case of discriminatory discharge because he fails to identify a similarly situated comparator who was treated more favorably.[99]

"When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, [the court must] evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."[100]  A proper comparator is an employee outside of the plaintiff's protected class who is similarly situated to the plaintiff "in all relevant respects."[101]  If this is not the

---

[97] *Id.* at 253.
[98] *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).
[99] Plaintiff only points to two employees, one African American and one Caucasian, who both sold scrap metal, but were punished differently.
[100] *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quotation omitted).
[101] *Holyfield*, 115 F.3d at 1562.

case, "the different application of workplace rules does not constitute illegal discrimination."[102]

In determining whether a comparator is similarly situated to the plaintiff, the Eleventh Circuit has stated that "[t]he relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies."[103]   However, "the quantity and quality of the comparator's misconduct must be nearly identical [to the plaintiff's] to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."[104] "The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."[105]

Plaintiff presents Brian Trent, a white Gas Department supervisor, as a comparator for purposes of this analysis.   Brian Trent was found guilty in a City investigation for taking scrap metal from the City, selling it, and keeping the money for himself.[106]   Trent's punishment was a four-day suspension, rather than termination. However, the Court finds Trent is not sufficiently similar to be a proper comparator.

---

[102] *Lanthem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999).
[103] *Id.* at 793.
[104] *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); s*ee also Burke-Fowler*, 447 F.3d at 1323.
[105] *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008).
[106] White Dec., [Doc. 31-6] at para. 13-14.  Plaintiff only points to this one disciplinary action taken against Trent and fails to point to any other infractions Trent may have committed as a City employee.

23

Trent works in a different department than Plaintiff, he is a Supervisor of that department, and he was punished for taking scrap metal from work and selling it for a profit. Plaintiff, on the other hand, was terminated for insubordination, ineffective job performance, and unbecoming behavior of a City employee. [107]   Plaintiff does not allege that there are any reports of Trent's insubordination or ineffective job performance, nor does he argue that they committed a similar offense.  Based on the differences in their employment status and the nature of their offenses, Plaintiff is unable to show that Trent is a proper comparator who is similarly situated to Plaintiff in all relevant respects. [108]

The Court recognizes that if Plaintiff is unable to establish his claim he may still survive summary judgment if he "presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the

---

[107] Pl. Formal Notice of Termination [Doc. 40, Exhibit A] at 4.

[108] Plaintiff seems confused in his comparator analysis and fails to present the court with a comparator to Plaintiff.   Instead, Plaintiff compares Trent with another African-American coworker, Robert Boswell, who was also punished for selling scrap metal.  Plaintiff states that Boswell and Trent were similarly situated employees in all relevant respects, but their punishments were gravely different for the same infraction.  Boswell, the African-American employee, was terminated, while Trent, the Caucasian employee, was only suspended for four days.  However, to make out the *prima facie* case, Plaintiff's comparator analysis must revolve around him and a similarly situated employee, not how Boswell and Trent compare to each other.  Additionally, Defendants state that Boswell was the head of a department, rather than a supervisor, and another black supervisor who was caught selling scrap metal was also only suspended for four days. White Dec., [Doc. 31-6] at para. 13-14.

decisionmaker."[109]   However, Plaintiff has failed to present circumstantial evidence of a

convincing mosaic showing the real reason for his termination was his race, rather than

the City's stated reasons of ineffective job performance, insubordination, and

unbecoming conduct of a City employee.   At most, Plaintiff alleges that Defendant

White was biased and treated the white Gas Department employees differently than

Plaintiff. [110]   According to Plaintiff, White ate lunch with the white employees and

"collaborated with them all of the time;" White defended the Gas Department

employees when Plaintiff complained about them; White failed to support Plaintiff or

take his complaints seriously; and White followed Plaintiff around during one of his

shifts, which he did not do to any other employees.[111]   Even assuming that this evidence

showed White favored his white employees over Plaintiff, Plaintiff still fails to provide

enough evidence for a jury to infer he was terminated based on his race.[112]   Therefore,

---

[109] *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotation marks omitted) (quoting Silverman, 637 F.3d at 734).

[110] Pl. Dep., [Doc. 33] at 131.

[111] *Id*. at 131, 133-134.  Plaintiff claims that when he tried to complain about the Gas Department employees White responded, "They hadn't said anything about you." *Id*. at 131.

[112] *See Meyer v. Secretary, U.S. Dep't of Health and Human Services*, 592 F. App'x 786, 791 (11th Cir. 2014) ("Because [Plaintiff's] mosaic of circumstantial evidence can do no more than raise an inference that [her employer] terminated her partly because of her disability and partly because of violations of HHS policy, [Plaintiff] failed to establish a prima facie discrimination claim…."); *Beckles v. Fed. Express Corp.*, 489 F. App'x 380, 384-85 (11th Cir. 2012) (holding that there was not enough circumstantial evidence to create a convincing mosaic when there was a management meeting directing management to vote for McCain, Plaintiff was quickly terminated just upon

because Plaintiff cannot meet the *prima facie* case for discriminatory discharge the Court

grants Defendant's Motion for Summary Judgment.

C.  *Legitimate Non-discriminatory Reason and Pretext*

Even assuming, arguendo, that Plaintiff established his *prima facie* case of

discrimination or a "convincing mosaic" of intentional discrimination, Defendants are

still entitled to summary judgment because Plaintiff cannot show Defendants'

legitimate, non-discriminatory reason for termination is merely pretext for race

discrimination.   Under the burden-shifting framework, Defendants must proffer

legitimate non-discriminatory reasons for Plaintiff's termination.   The burden on

Defendants is one of production, not persuasion, and the Defendants need only

produce credible evidence supporting the decision.[113]

Defendants proffer the following reasons for terminating Plaintiff: (1) Plaintiff

demonstrated inefficiency or ineffectiveness on the job when White witnessed him fail

to pick up piles of yard debris on August 19th, 2010, and received several complaints

---

management hearing allegations of fraud, and Plaintiff learned that there was a previous case
where management was accused of making racial slurs).

[113] *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) ("However, the
employer's burden is merely one of production; it need not persuade the court that it was
actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a
genuine issue of fact as to whether it discriminated against the plaintiff." (internal quotation
marks omitted)).

from citizens about the fact that the City was behind in picking up tree limbs;[114] (2) Plaintiff's unbecoming conduct because he yelled at a court clerk while wearing a City uniform and was held in contempt of court for allegedly threatening a police officer;[115] and (3) Plaintiff's insubordination on August 20, 2010, when he physically "bowed up" and had a hostile attitude towards White, and again, on November 4, 2010, when Plaintiff continuously tried to interject himself into White's conversation with other supervisors after being told to back off.[116]  Defendants have met the "exceedingly light" burden of producing a legitimate non-discriminatory reason, and the burden now shifts to the Plaintiff to establish pretext.[117]

To establish pretext a "plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision.... [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered

---

[114] White Dec., [Doc. 31-6] at para. 3, 4, 6.

[115] *Id*. at para. 5, 7, 8.  The clerk incident occurred on August 19th, 2010, and White was under the impression that Plaintiff had raised his voice at the courtroom clerk, implied that City employees should not get tickets, and told her to fix the situation. *Id.*  White was also made aware that on September 15, 2010, Plaintiff was held in contempt of court and ordered to severe 24-hours in jail because Plaintiff had threatened a police officer. *Id*. at para. 8.

[116] *Id*. at para. 6, 7.

[117] *Vessels v. Atlanta Indep. Sch. Sys*., 408 F.3d 763, 769-770 (11th Cir. 2005).

explanation is unworthy of credence."[118]  However, "if the employer proffers more than one legitimate nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment."[119]  "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered ... extensive evidence of legitimate, non-discriminatory reasons for its actions."[120]  Evidence establishing pretext may include the same evidence initially offered to establish the *prima facie* case of discrimination.[121]

The Court finds Plaintiff is unable to rebut Defendants' legitimate, non-discriminatory proffered reasons for Plaintiff's termination.  Plaintiff merely argues each incident did not occur exactly as Defendants described it and fails to show Defendants' reasons for terminating Plaintiff are unworthy of credence.[122]  "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute

---

[118] *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (emphasis added) (internal quotation marks and citation omitted).

[119] *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir.2007).

[120] *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (internal quotation marks and citation omitted).

[121] *Wilson v. B.E. Aerospace*, 376 F.3d 1079, 1088 (11th Cir.2004).

[122] *See Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) ("A reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" (internal quotation marks omitted)).

28

his business judgment for that of the employer."[123]  The pretext inquiry centers around the employer's beliefs and Plaintiff must show more than the proffered reasons were ill-founded.[124]  Specifically, if "the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason."[125]

First, Plaintiff states he drove past the limbs because he was covering another employee's shift and was therefore working a different route.[126]  Second, Plaintiff states he did not yell at the clerk in an angry manner, but instead they were both just speaking loudly, and she was lecturing him.[127]  Third, Plaintiff claims he was held in contempt of court for calling the witness police officer a liar, not for threatening the ticketing officer.[128]  Lastly, Plaintiff says he was just defending himself and his work after White accused him of not working.[129]

---

[123] *Chapman*, 229 F.3d at 1030.

[124] *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

[125] *Chapman*, 229 F.3d at 1030; *see also Nix v. WLCY Radio/Rehall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

[126] Pl. Dep., [Doc. 33] at 84.

[127] *Id.* at 184-85.

[128] *Id.* at 188-89.

[129] Pl. Aff., [Doc. 31-3] at 16-17.

Plaintiff's explanations fail to establish that White's reasons were false or that a discriminatory reason was more likely the cause for termination.  Moreover, Plaintiff's dispute about the underlying facts of the incidents do not change what White witnessed or what was reported to him regarding the incidents.  Defendant White investigated the situation with the court clerk, and each witness gave a written statement that Plaintiff had raised his voice at the clerk.  Moreover, the clerk stated she felt threatened and asked Plaintiff to leave her office after it occurred.[130]  Further, White witnessed Plaintiff drive past multiple piles without picking them up, and Plaintiff admits both that he had a confrontation with White and stood up to defend his work.[131]  Thus, based on this information and first-hand experience, Defendant White made a reasonable business decision to terminate Plaintiff.  Plaintiff fails to rebut Defendants' reasons and is unable

---

[130] White Dec., [Doc. 31-6] at para. 5, 7; White Dec., [Doc. 31-6, Exhibit D] at 21-24.  Plaintiff only admits that he may have raised his voice with the court clerk, but not in an angry way.  Pl. Dep., [Doc. 33] at 185.

[131] Pl. Dep., [Doc. 33] at 79-80; Pl. Aff., [Doc. 31-3] at para. 16-17.  White did apologize to Plaintiff afterward for speaking to him in an unprofessional manner when he first confronted him, and White confirmed that Plaintiff had been asked to cover a different route than the one he normally drove that day. Pl. Aff., [Doc. 31-3] at para. 16-17; White Dec., [Doc. 31-6] at para. 6. However, White still felt that Plaintiff's reaction after he confronted him was not an appropriate way to speak to a supervisor.  White Dec., [Doc. 31-6] at para. 6.

to point out any real "weaknesses, implausibilities, inconsistencies, or contradictions" in Defendants' rationale.[132]

Based on the evidence presented, Plaintiff has failed to show there was a genuine issue of material fact as to whether Defendants' reasons for Plaintiff's termination were pretextual.[133]  Further, without a similarly situated comparator[134] or any other sufficient evidence to support an inference of intentional discrimination, Plaintiff has failed to establish his claim of racial discrimination, and Defendants are entitled to judgment as a matter of law.

**Retaliation**[135]

Plaintiff again attempts to bring a retaliation claim based on an EEOC complaint of discrimination.  However, this Court has already held Plaintiff is precluded from

---

[132] *See Holland v. Gee*, 677 F.3d 1047, 1055–56 (11th Cir.2012).  The Court does note that Plaintiff claims the timing in events and his firing creates a weakness regarding the reasons he was fired. Plaintiff was fired on November 23, 2010, while these events occurred in August and September, and the last one taking place on November 4, 2010.  However, White states he was investigating the clerk incident, he was on vacation in October, and then Plaintiff took time off after the November 4th incident due to a burn injury he suffered at home. Pl. Dep., [Doc. 33] at 199; White Dec., [Doc. 31-6] at para. 9-11.

[133] *See Jackson*, 405 F.3d at 1291 (granting summary judgment for the employer because plaintiff failed to point "to evidence that created a genuine issue that the reasons that the Board gave were false or that a discriminatory reason was more likely the cause of his termination.")

[134] The Court notes again that Plaintiff relies on two employees of different races who sold scrap metal and were punished differently.   However, Plaintiff does not present an employee similarly situated to him, thus his comparator analysis fails.

[135] *See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (analyzing retaliation claims under Title VII and § 1981 the same).

31

bringing this claim.[136]  "A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."[137]   The Court declines to consider Plaintiff's retaliation claim regarding his EEOC filing.

The Court recognizes that Plaintiff's original Complaint alleges a potential retaliation claim based on safety violation complaints.   However, to be a statutorily protected activity under Title VII, the employee's complaints must have referred to racial harassment or discrimination.[138]   Plaintiff alleges he was terminated "in retaliation for his reports of ongoing safety violations being committed by The City,"[139] pursuant to Title VII.[140]   Such conduct, however, is not a protected activity under Title VII.[141]

---

[136] Motion to Amend Complaint was Denied. [Doc. 30].

[137] *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

[138] *See Sridej v. Brown*, 361 Fed. App'x 31, 35 (11th Cir. 2010) ("The employee's statements, however, must be about race or gender discrimination to fall within the scope of protected expression under Title VII."); *see also Crawford v. Metropolitan Gov't of Nashville and Davidson Cnty., Tenn.*, 555 U.S. 271, 273 (2009); *Pipkins v. City of Temple Terrace, Fl.*, 267 F.3d 1197, 1201 (11th Cir. 2001); *Wilmore-Cochran v. Wal-Mart Associates, Inc.*, 929 F.Supp.2d 1222, 1234 (N.D. Ala. 2013) ("[I]n order to constitute statutorily protected activity capable of supporting a § 1981 retaliation claim, an employee's complaint must reasonably convey that she is opposing discrimination based specifically upon race, versus some other type of discrimination or injustice generally.").

[139] Pl. Complaint, [Doc. 1] at para. 21.

[140] Plaintiff did not allege a retaliation claim for raising safety concerns in violation of the Occupational Safety and Health Act (OSHA).  *See Solia v. Blue Bird Corp.*, 404 Fed. App'x 412 (11th Cir. 2010). Plaintiff only brings claims for violation of Title VII and claims under 42 U.S.C. §§ 1981 and 1983. *Id.* at 12, 14.  Plaintiff's § 1981 and § 1983 claims would also be analyzed the same under Title VII.

[141] *See supra* note 131.

Consequently, Defendants Motion for Summary Judgment regarding the retaliation based on safety complaints is granted.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment [Doc. 31] is hereby **GRANTED**.

**SO ORDERED,** this 30th day of September, 2015.

S/  C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE